## THE CHIPPEWA.

### NORTHWESTERN FIRE & MARINE INS. CO. v. BOUKER CONTRACTING CO.

District Court, S. D. New York.
April 29, 1935.

Purdy & Purdy, of New York City (Frank C. Mason, of New York City, of counsel), for libelant.

Foley & Martin, of New York City (C. E. Heckman, of New York City, of counsel), for respondent.

COXE, District Judge.

This is a libel to recover for damage to the scow Chippewa while under charter

to the respondent in January, 1930. The libelant is an insurance company, which insured the owners of the scow against loss, and in February, 1930, the libelant paid the owners $1,336.24 in full settlement of their claim, taking at the time an assignment of the owners' claim against the respondent.

The Chippewa was a deck scow, 114 to 115 feet long, 32 feet beam, and about 2 years old; on January 3, 1930, she was orally chartered to the respondent for the period from January 4, 1930, to January 10, 1930, delivery to be made at the Interborough ash dump at Fifty-Ninth street and the North River. The Chippewa had been moored at the basin at Smith's Drydock, Edgewater, N. J., for about ten days prior to January 3, 1930, and was substituted for the Barnett, which was the scow named to the respondent when the charter was negotiated.

The Chippewa was towed from Edgewater to Fifty-Ninth street by the tug Express, which came to Edgewater in the late afternoon of January 3, 1930, for the purpose of moving the Barnett; but, on arrival, it was found that the Barnett was aground; and, after communicating with the Marine Transit Company, representing the owners, the master of the Express substituted the Chippewa for the Barnett. Smith, the president of Smith's Drydock at Edgewater, testified that he telephoned to Markel of the Marine Transit Company, regarding the substitution of the Chippewa for the Barnett, and, on instructions from Markel, went to the Chippewa and made an inspection of her, taking from one-half hour to forty minutes for the examination, and found the scow in good condition, with no broken planks. I do not think, though, that this inspection by Smith could at most have been anything but superficial, for the tug Express did not reach Edgewater until about 6 p. m., and the Interborough records show that the Chippewa arrived at the Fifty-Ninth street dock at 7 p. m. Moreover, according to the testimony of Bragg, master of the Express, there was no time to make a careful inspection of the Chippewa, after instructions had been received from the Marine Transit Company to substitute the Chippewa in place of the Barnett, as the Express went directly to the Chippewa and "hooked her on and away we went."

The Chippewa was to be used in loading ashes, and when she arrived at the Fifty-Ninth street dock, at about 7 p. m. on Friday, January 3, 1930, there was another scow then loading at the chute, and it was not until the following day, or possibly later, that the Chippewa was moved into place alongside the bulkhead to be loaded with ashes. On Monday morning, January 6, 1930, Thompson, a scow inspector of the respondent, made an examination of the Chippewa, at the Fifty-Ninth street dock, taking two or three hours for the purpose, and he then discovered that there were broken planks on both sides of the scow. He testified that at that time the Chippewa was about one-quarter loaded. On the following day, January 7, 1930, Shortt, representing the owners of the scow, went to the Fifty-Ninth street dock and examined the broken planks. He testified that the scow was then under the chute, with her port side to the dock, and about one-third loaded. He also stated that the damage consisted of two broken planks on the port side, approximately 12 feet from the stern, and similar broken planks on the starboard side, "about half-way * * * between amidships and astern." Luedermann, an engineer in the employ of the Interborough Company, and in charge of ash removal at the Fifty-Ninth street dock, also saw the Chippewa on January 7, 1930, and inspected the damage on one side; and he estimated that the scow was then about three-quarters loaded.

The Chippewa was surveyed at Jersey City on January 17, 1930, and the survey shows that the second, third, and fourth planks above the bottom log on the starboard side aft, and the first and second planks above the bottom log on the port side aft, were broken; and although there was testimony to the effect that the broken planks on the starboard side were forward of amidships, I do not believe that this testimony is sufficient to contradict the express statement to the contrary in the survey, particularly as libelant's own witness, Shortt, testified positively that the broken planks on the starboard side were on the stern quarter.

The practice in loading long scows at the Fifty-Ninth street dump, was to load one end, and then wind the scow around, so as to bring the other end up to the chute. Luedermann said that ordinarily it took three to four days to load such a scow as the Chippewa; and he testified that the scow had not been winded around by January 6, 1930. This seems also to be

378

borne out by the fact that on Monday morning, January 6, 1930, Thompson found the Chippewa only one-quarter loaded, and Shortt, libelant's own witness, testified that she was only one-third loaded when he saw her at about 4 p. m. on January 7, 1930.

The bulkhead in the immediate vicinity of the ash dump was in good condition, with no loose fender piling, but to the north of the dock the bulkhead fell away inward, and there was a discharge outlet from the power plant emptying into the river on the extreme end. This discharge opening was faced with concrete, but the photographs show on the northerly side some jagged pieces of rock projecting outward, and it is the contention of the libelant that when the scow was winded around both sides came in contact with these jagged pieces of rock, thereby breaking the planks.

The difficulty with this contention is that the broken planks on both sides of the Chippewa were aft, and from 12 to about 25 feet from the stern; and if the scow had been winded around in the manner indicated, any damage caused by striking or rubbing against the facing of the discharge outlet would necessarily have appeared on opposite ends of the scow. Furthermore, it is highly improbable that the scow was winded around prior to January 6, 1930, when the damage was first discovered, as the scow was only one-quarter loaded on the morning of January 6, 1930, and there was no reason for winding her around until the loading had been substantially completed at one end.

I do not think, therefore, that it has been shown that the scow was in undamaged condition when she was placed under charter on January 4, 1930, and the burden was on the libelant to make this showing. The testimony of Smith, with respect to his inspection of the scow at Edgewater on January 3, 1930, was quite unsatisfactory, and I do not think it is entitled to any weight in establishing that the planks were unbroken. I do not think, either, that the proof is sufficient to warrant a finding that the damage, as shown by the survey, was the result of anything which happened to the scow while being loaded at the Fifty-Ninth street dock.

There may be a decree for the respondent, dismissing the libel, with costs.